Mark B. LEBOW, Plaintiff–Appellant,

v.

**AMERICAN TRANS AIR, INC.,**
**Defendant–Appellee.**

No. 95–2665.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1996.

Decided June 6, 1996.

Richard C. Leng (argued), Leng, Stowell, Friedman & Vernon, Chicago, IL, for Plaintiff–Appellant.

Charles R. McKirdy, James D. Roberts, Rudnick & Wolfe, Chicago, IL, John J. Gallagher, Jon A. Geier (argued), Randall M. Stone, Neal David Mollen, Paul, Hastings, Janofsky & Walker, Washington, DC, for Defendant–Appellee.

Before ESCHBACH, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

This case requires us to answer two questions of first impression in any United States Court of Appeals: whether an employee suing an employer under the Railway Labor Act for discharging him because of his union-organizing activities is entitled (1) to a jury trial and (2) to seek punitive damages. We hold that he is entitled to both, and we reverse and remand for further proceedings.

In June 1991, American Trans Air (ATA) fired Mark Lebow from his position as an airline pilot. Lebow filed suit under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, claiming that ATA discharged him because of his union-organizing activities.[1] He sought reinstatement, back pay, benefits, compensatory damages, and punitive damages. Lebow also demanded a jury trial. ATA claimed that it terminated Lebow because of his job performance. In addition, the airline argued that the RLA does not provide Lebow with the right to a jury trial

---

1. The RLA covers airlines as well as railroads. 45 U.S.C. § 181. Employees who are fired for engaging in union activities have an implied right of action against their employers under the RLA. *Texas & N.O.R. Co. v. Brotherhood of Railway and Steamship Clerks,* 281 U.S. 548, 568–69, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930).

or to recover punitive damages. The district court held that Lebow could seek punitive damages but was not entitled to a jury trial. After a bench trial, the district court entered judgment in favor of ATA. Lebow appeals, arguing that he was denied his Seventh Amendment right to a trial by jury.

## I.

As an initial matter, ATA argues that we need not reach the question of whether Lebow was entitled to a jury trial because the evidence introduced at trial was insufficient to support his claim of anti-union animus. ATA would be entitled to judgment as a matter of law only if " 'there can be but one conclusion from the evidence' and inferences reasonably drawn therefrom." *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir.1995) (*quoting McNabola v. Chicago Transit Authority*, 10 F.3d 501, 515 (7th Cir.1993)). The evidence that Lebow presented at trial in support of his claim follows.

Lebow joined ATA as a Flight Engineer (the third in command on an airplane) in 1983. He was promoted to First Officer in 1985 and to Captain in 1989. From 1989 to 1991, he served as the Captain of a Boeing 727 airplane.

During Lebow's tenure at the airline, ATA's pilots were not represented by a union. In 1989, Lebow began working on a campaign to have the pilots at ATA represented by the Airline Pilots Association (ALPA). The campaign was quiet, even secretive. Lebow and Earl Rogers, another ATA pilot, testified that the organizers of the ALPA campaign proceeded quietly because, as ATA opposed unionization, they feared retaliation. Rogers identified Lebow as one of the "primary organizers" of the campaign. The drive to bring the ALPA to ATA, however, ultimately failed.[2]

Lebow testified that he was actively involved in union-organizing activities. He passed out authorization cards and also "spoke with many people, anybody that wished to talk about" the union. He attend-ed meetings in Virginia and Las Vegas to discuss the possibility of organizing ALPA representation at ATA. In addition, he discussed his pro-union sentiments with ATA officials on several occasions. In early 1991, Lebow resigned from the Crew Scheduling Advisory Committee (a committee of pilots and managers composed to discuss scheduling issues). Lebow stated that he told Steve Cooper, ATA's Vice President of Flight Operations, that "I was no longer going to attend the Crew Scheduling Advisory Committee [meetings] and that I would continue to work on my concerns through the union by trying to organize a union." Also in 1991, Lebow attended a training class in Indianapolis where Jim Hlavacek (an Executive Vice President of ATA) and Ken Wolf (another senior manager) showed the pilots a videotape produced by the company to discourage flight attendants from organizing a union.[3] A discussion between Hlavacek and the pilots ensued, and Lebow presented the union perspective in response to the management perspective offered by Hlavacek. Following the training class, Lebow and Hlavacek had a private conversation, and Lebow explained to Hlavacek why he believed that a union was necessary. Hlavacek told Cooper about his discussion with Lebow.

Lebow testified that in May or June of 1991, he had a conversation with his direct supervisor, Captain Tom Leonard, during which Leonard asked him, "what do you think about unions?" Lebow responded that he felt the pilots "had no choice but to go to the unions." Lebow's wife, Donna Lebow (she was then his fiancee) was present during this conversation, and she confirmed Lebow's account of the exchange. Cooper and Hlavacek acknowledged that they knew of Lebow's pro-union sentiments, but they denied knowledge of his union-organizing activities.

ATA made no secret of its opposition to unionization. Cooper felt that unionization would have an adverse financial impact on ATA, and Hlavacek opposed unions because he had previously worked at Continental Air-

---

2. The International Brotherhood of Teamsters has represented ATA's pilots since 1993.

3. A campaign to organize a flight attendants' union, which ultimately succeeded, was also in progress at that time.

lines, where he observed a union "basically tearing the company apart." Cooper wrote several letters to the pilots in an effort to discourage them from bringing either the ALPA or the Teamsters to ATA. In addition, ATA managers wore "One Team" badges in opposition to unionization efforts.

Rogers testified that Mike Carlozzi, ATA's Chief Pilot, told him that "a union would never work at ATA, that it would interfere with the [airline's] competitive position within the industry." Rogers stated further that Carlozzi "followed up his remarks by talking about what a difficult time it was in the industry for pilots to find work, and on his desk he had a large stack of resumes." Finally, Rogers testified that two pilots (Rick Reese and Andy Sperling), whom he knew to be active union organizers, were fired by ATA.

In June 1991, Lebow was scheduled for a proficiency check, which as a Captain he was required to take twice a year. Lebow was originally scheduled to take the "check ride" on June 18, but ATA rescheduled his check for June 10 and assigned a different "check airman" to administer the check, Captain Stonehouse. Lebow stated that at a lunch meeting prior to the check, Stonehouse commented that "he hoped that all flight attendants that voted for the union would either lose their jobs or have serious pay cuts." Stonehouse then administered the proficiency check to Lebow. The check lasted 40–45 minutes rather than the usual two hours. Lebow failed the check, and it was the first time that he had failed a proficiency check (he had taken approximately 15 previous checks) during his employment with ATA.

After failing the check, Lebow discussed the matter with Cooper. Cooper told him to be prepared to take another proficiency check. In addition, Cooper observed that "we [Cooper and Lebow] have had our differences." Cooper then pounded on the table and said, "this will not continue."

After this meeting, Lebow discussed his failure on the proficiency check with Rich Moreau, ATA's Chicago base manager. Lebow testified that Moreau told him that "he

was going to ... try to help me out ... [but] the wheels were already turning and he didn't think he could do very much." Lebow claimed that Moreau told him that "this did not have to do with my performance but, instead, had to do with my conversation with Mr. Hlavacek and also because of [union] organizing."

On June 24, 1991, Lebow and Cooper met again, ostensibly to discuss the failed proficiency check. Leonard and Carlozzi were also present at the meeting. Cooper opened the meeting by informing Lebow that he was fired. Lebow asked Cooper what the reason was, and Cooper replied, "technical proficiency." Carlozzi then added "not conforming to company policy," but Cooper "quickly corrected [him] back to technical proficiency."

At trial, ATA argued that it fired Lebow because of the combined effect of the failed proficiency check and three other incidents in his work history: (1) a failed attempt to "upgrade" to Captain in May 1988 (when Lebow was still a First Officer); (2) an incident in St. Thomas, Virgin Islands in April 1990 where the wing tip of Lebow's plane may have touched the runway during take-off; and (3) an aborted take-off in Phoenix in May 1990.[4] ATA presented evidence (including expert testimony) that Lebow made mistakes during these incidents that justified his discharge. Lebow presented evidence (including expert testimony) that (1) the proficiency check was administered unfairly; (2) Lebow performed proficiently during the St. Thomas and Phoenix incidents; and (3) the failed attempt to upgrade was caused by emotional distress that Lebow was experiencing (the night before the upgrade attempt, Lebow's wife informed him that she wanted a divorce). Additionally, Lebow contended that ATA should not have held his failure on the initial attempt against him because he successfully upgraded to Captain in 1989.

■ Although we have not previously addressed this issue, we believe that the same burden-shifting method employed in unlawful discharge claims brought under the

---

4. The district court concluded that Lebow should not have been faulted for the aborted take-off, and ATA does not discuss this incident in its appellate brief.

National Labor Relations Act (NLRA) applies to claims brought under the RLA. *See ALPA v. Eastern Air Lines, Inc.,* 863 F.2d 891, 902 (D.C.Cir.1988) (adopting same standard in RLA and NLRA cases), *cert. dismissed,* 501 U.S. 1283, 112 S.Ct. 38, 115 L.Ed.2d 1119 (1991); *cf. Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 432, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989) ("[C]arefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA."). In cases brought under the NLRA, the employee bears the burden of "proving by a preponderance of evidence that ... [his] protected conduct was a substantial or motivating factor in [his] discharge." *Union–Tribune Publishing Co. v. NLRB,* 1 F.3d 486, 490 (7th Cir.1993); *see also NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983). If the employee does so, "the burden shifts to the employer to prove by a preponderance of the evidence that the employee would have been fired anyway for a valid reason." *Union Tribune,* 1 F.3d at 490; *see also Transportation Management,* 462 U.S. at 402–03, 103 S.Ct. at 2474–75.[5]

■ To establish that anti-union animus was a substantial or motivating factor in his discharge, an employee must demonstrate that (1) he "engaged in union ... activities; (2) the employer knew of the employee's involvement in protected activities; (3) the employer harbored animus towards those activities; and (4) there was a causal connection between the employer's animus and its discharge decision." *Carry Companies of Illinois, Inc. v. NLRB,* 30 F.3d 922, 927 (7th Cir.1994). An employee may prove his case

using either direct or circumstantial evidence. *Union Tribune,* 1 F.3d at 490; *NLRB v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1267 (7th Cir.1987).

Although there is no dispute that Lebow engaged in union activities, ATA contests the sufficiency of Lebow's proof on the remaining three elements. We conclude, however, that Lebow presented sufficient evidence for a rational jury to find in his favor.

■ First, Lebow's many discussions, debates, and exchanges with the ATA management concerning unionization, Rogers' testimony that Lebow was one of the "primary organizers" of the ALPA campaign, and Lebow's testimony that he engaged in a number of union-organizing activities (including attending out-of-town planning sessions and handing out authorization cards) constitute sufficient circumstantial evidence for a jury to infer that ATA's management knew of Lebow's union involvement. The district court credited Cooper's statement that he did not know of Lebow's activities, and the finder of fact of course has the duty of judging the credibility of witnesses. But a reasonable factfinder could have arrived at a different conclusion.

■ In addition, Lebow presented sufficient evidence for a jury to infer that ATA harbored anti-union animus. The trial transcript reveals that ATA's management strongly opposed unionization. ATA argues that mere opposition to unionization is not synonymous with anti-union animus. We have stated that under the NLRA, "noncoercive expressions of opinion are not to be used as evidence of an unfair labor practice." *Carry Companies,* 30 F.3d at 927; *see* 29 U.S.C. § 158(c).[6] The record in this case,

**5.** This standard was announced by the National Labor Relations Board (NLRB) in *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1980 WL 12312 (1980). The Supreme Court later approved the *Wright Line* standard. *See Transportation Management,* 462 U.S. at 402–03, 103 S.Ct. at 2474–75. In *Director, Office of Workers' Compensation Programs, Dept. of Labor v. Greenwich Collieries,* — U.S. —, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Court rejected the conclusion in *Transportation Management* that the Administrative Procedure Act (APA) allows the burden of proof to be placed on the employer. *Id.* at —— ——, 114 S.Ct. at 2258–

59; *see Transportation Management,* 462 U.S. at 403 n. 7, 103 S.Ct. at 2475 n. 7. However, the Court stated that the *Wright Line* standard is consistent with the APA because it "first require[s] the employee to [prove] ... that anti-union sentiment contributed to the employer's decision. Only then [does *Wright Line*] ... place the burden of persuasion on the employer as to its affirmative defense." *Greenwich Collieries,* — U.S. at —, 114 S.Ct. at 2258.

**6.** The circuits are split regarding the evidentiary value of non-coercive statements. *See, e.g.,*

however, contains sufficient evidence of anti-union animus. Moreau's warning that Lebow was in trouble because of his union activities qualifies as evidence of animus under any definition.[7] In addition, Cooper's statement that his differences with Lebow "will not continue" arguably implies that the discharge was motivated by the debates between Cooper and Lebow concerning unionization. Finally, Carlozzi's anti-union remarks to Rogers followed by his comment that it was a "difficult time" to find work as a pilot could reasonably be viewed as coercive. Taken together, these incidents constitute sufficient evidence for a rational jury to conclude that anti-union animus played a role in ATA's decision to terminate Lebow.

Next, the finder of fact could reasonably infer a causal connection between Lebow's discharge and his union activities. The numerous exchanges between Lebow and ATA's management concerning unionization occurred during the spring of 1991, and the debates continued until his discharge in June 1991. In addition, Moreau's statement implies that ATA's decision was related to Lebow's union-organizing activity. Finally, Cooper's statement that his differences with Lebow "will not continue" and Carlozzi's statement that Lebow's discharge was for "not conforming to company policy" may imply a causal connection. This evidence is sufficient to allow a reasonable factfinder to

conclude that Lebow's discharge was related to his union activities.

 Finally, both sides presented voluminous expert testimony concerning the incidents that ATA claimed were the real reasons for Lebow's discharge and that Lebow claimed were mere pretexts. The resolution of this "battle of experts" is best reserved for the trier of fact. Thus, because a rational factfinder could find in favor of Lebow, we must determine whether he was entitled to a jury trial.

## II.

 Lebow argues that the district court infringed his Seventh Amendment rights by denying him a jury trial. No circuit has discussed whether an employee suing his employer under the RLA for discharging him because of his union activities is entitled to a jury trial.[8] We conclude that Lebow has a Seventh Amendment right to present his claim to a jury.

 The Seventh Amendment states that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." By using the phrase "suits at common law," the Constitution mandates jury trials for legal actions but not for equitable actions. *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990).

*NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1474 (6th Cir.1993) (protected speech may be used as "background in [the] determination of animus"); *Holo–Krome Co. v. NLRB*, 907 F.2d 1343, 1346 (2d Cir.1990) (protected statements may not be used as evidence of anti-union animus).

7. At oral argument, ATA attempted to discredit this statement because Moreau did not testify; rather, Lebow testified that Moreau made the statement. This fact, however, is irrelevant because the statement was properly introduced into evidence as an admission. Fed.R.Evid. 801(d)(2). ATA could have called Moreau to rebut this testimony, and in any event the trier of fact is entitled to judge Lebow's credibility as a witness.

8. The district courts that have addressed the issue are split. In *Freiburger v. Emery Air Charter, Inc.*, 795 F.Supp. 253 (N.D.Ill.1992), the court held that a jury trial was available because compensatory and punitive damages were sought. *Id.* at 261. Other courts have denied plaintiffs a

jury trial on the ground that only equitable remedies were sought or available. See *Tipton v. Aspen Airways, Inc.*, 741 F.Supp. 1469, 1472 (D.Colo.1990) (jury trial not available because plaintiffs are "limited to equitable remedies under the RLA"); *Maas v. Frontier Airlines, Inc.*, 676 F.Supp. 224, 227 (D.Colo.1987) (jury trial not available because compensatory and punitive damages are not recoverable under the RLA); *Hodges v. Tomberlin*, 510 F.Supp. 1280, 1286 (S.D.Ga.1980) (jury trial not available because plaintiff sought only equitable relief and merely made "unsupported allegations of compensatory and punitive damages") (internal quotations omitted). One court denied the plaintiff a jury trial even though he requested punitive damages, stating that "[t]he mere fact that plaintiffs seek punitive damages *does not change the nature of* their claim to a legal one." *Hodges v. Virgin Atlantic Airways, Ltd.*, 714 F.Supp. 75, 77 (S.D.N.Y.1988).

The federal courts have long since abolished the distinction between "courts of law" and "courts of equity;" therefore the Supreme Court has adopted a two-part test to determine whether a claim qualifies as legal or equitable. First, we must "compare the ... action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second inquiry is the more important in our analysis." *Terry,* 494 U.S. at 565, 110 S.Ct. at 1345 (internal citations and quotations omitted); *cf. Markman v. Westview Instruments, Inc.,* —— U.S. ——, —— ——, 116 S.Ct. 1384, 1389–90, 134 L.Ed.2d 577 (1996).

### A.

We can identify no exact eighteenth-century parallel for Lebow's claim that ATA fired him because he was engaged in union-organizing activities. In eighteenth-century England, labor unions were illegal, and employees who engaged in collective bargaining were subject to criminal penalties. *See Terry,* 494 U.S. at 565–66, 110 S.Ct. at 1344–45; *Truax v. Corrigan,* 257 U.S. 312, 357–58, 42 S.Ct. 124, 138–39, 66 L.Ed. 254 (1921) (Brandeis, J., dissenting).[9] Thus, Lebow's claim could not have been raised in the eighteenth century.

Despite the lack of a precise eighteenth-century counterpart, Lebow's unlawful discharge claim, in our view, may be appropriately analogized to a common-law breach of contract action. In *Terry,* the Supreme Court concluded that although an employee's suit against a union for breach of duty of fair representation had no true eighteenth-century analogue, it was, at least in part, similar to a common-law breach of contract action. *Terry,* 494 U.S. at 569–70, 110 S.Ct. at 1347–48. The Court came to this conclusion because to recover against a union on a fair representation claim, the employee must first prove that the employer violated the collective bargaining agreement. *Id.* at 564, 569, 110 S.Ct. at 1344, 1347. Lebow, however, does not need to demonstrate a breach of a collective bargaining agreement in order to prove his claim. Still, the effect of the RLA was that, as an implied term of Lebow's employment, ATA could not fire him for engaging in union activities. An unlawful discharge may be viewed as a breach of this implied contract.

In addition, unlike nineteenth-century American law, under which employees served at the will of their employers, the common law presumed that a contract existed between employers and employees. *See* Comment, *Section 1981 and Discriminatory Discharge: A Contextual Analysis,* 64 Temple L.Rev. 173, 214 n. 21 (Spring 1991); Douglas Laycock, *Due Process and Separation of Powers: The Effort to Make the Due Process Clause Nonjusticiable,* 60 Tex.L.Rev. 875, 897 n. 91 (May 1982). Under British common law, if there was no contract specifying a term of employment, "the law construe[d] it to be a hiring for a year." 1 W. Blackstone, *Commentaries on the Laws of England* 425. Employment by contract was the rule in eighteenth-century England, so an improper discharge would have been viewed as a breach of contract. Thus, Lebow's unlawful discharge claim is comparable to a common-law action for breach of an employment contract. *See Waldrop v. Southern Co. Services, Inc.,* 24 F.3d 152, 156 (11th Cir. 1994) (analogizing unlawful discharge claim under Rehabilitation Act to breach of contract action); *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518, 1524 (11th Cir.1991) (analogizing constructive discharge claim under Jury Act to breach of contract action); *Smith v. Barton,* 914 F.2d 1330, 1337 (9th Cir.1990) (unlawful discharge claim under Rehabilitation Act similar to action to enforce

---

9. In the early nineteenth century, American law was more tolerant of organized labor than British law. *See* William E. Forbath, *The Shaping of the American Labor Movement,* 102 Harv.L.Rev. 1109, 1149 n. 170 (April 1989). Prior to the civil war, there were no reported cases of American courts punishing labor organizers for noncoer-

cive practices, and those who were prosecuted received light sentences. *Id.* In the late nineteenth and early twentieth centuries, however, the federal courts frequently used their injunctive powers to restrain labor strikes (usually railway strikes). *See id.* at 1155–65.

employment contract), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991).

Lebow's lawsuit is also similar to a common-law tort action. In *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the Supreme Court held that plaintiffs bringing suit for a violation of Title VIII of the Civil Rights Act of 1968 were entitled to a jury trial. *Id.* at 198, 94 S.Ct. at 1010. Title VIII authorizes private plaintiffs to bring suit for violations of the fair housing provisions of the Civil Rights Act. 42 U.S.C. § 3612(a). The *Curtis* Court analogized this to a tort action, stating that "[a] damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis*, 415 U.S. at 195, 94 S.Ct. at 1009. Similarly, the RLA creates a new legal duty on employers not to fire employees who organize unions, and it allows tort-like suits for violations of this duty. Courts have used this reasoning to analogize suits brought against employers under the Rehabilitation Act and the Jury Act to common-law tort actions. *See Waldrop*, 24 F.3d at 156 (Rehabilitation Act); *Pandazides v. Virginia Board of Education*, 13 F.3d 823, 829 (4th Cir.1994) (Rehabilitation Act); *Hill*, 934 F.2d at 1524 (Jury Act); *Smith*, 914 F.2d at 1337 (Rehabilitation Act).

Hence, Lebow's unlawful discharge suit is comparable to common-law contract and tort actions. In eighteenth-century England, breach of contract actions were generally tried at common law, *see* E. Allen Farnsworth, *Contracts, Second Edition* §§ 1.5, 11.2 (Little, Brown 1990), and the *Terry* court described a common-law breach of contract claim as a "legal issue." *Terry*, 494 U.S. at 570, 110 S.Ct. at 1348.[10] This historical evidence, while not conclusive, lends some support to Lebow's argument that his unlawful discharge suit is a legal claim. The comparison to eighteenth-century English actions, however, is only part of test for whether Lebow is entitled to a trial by jury.

## B.

■ The second and most critical factor in the *Terry* analysis is the nature of the remedies that a plaintiff wishes to obtain. "The Seventh Amendment ... requires a jury trial upon demand[ ] if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis*, 415 U.S. at 194, 94 S.Ct. at 1008.

Lebow requested punitive damages in addition to reinstatement and back pay.[11] The district court held that he was entitled to seek punitive damages but could not have a trial by jury. We cannot agree that Lebow could have a right to request punitive damages but not to demand a jury trial. Punitive damages have traditionally been viewed as a legal remedy that must be imposed by a jury. *See* Note, *State–Law Punitive Damage Schemes and the Seventh Amendment Right to a Jury Trial in the Federal Courts*, 14 Rev.Litig. 657 (Summer 1995); Comment, *Toward a Uniform Application of Punishment: Using the Federal Sentencing*

**10.** Plaintiffs in eighteenth-century contract actions would, however, occasionally seek relief in chancery (equity) courts. Farnsworth, *Contracts* § 11.2. In addition, the *Smith* court noted that common-law tort and contract suits "could have been brought either in courts of law or courts of equity, depending on the relief sought." *Smith*, 914 F.2d at 1337.

**11.** Lebow asserts that he also sought compensatory damages, and his complaint does contain a request for compensatory damages. The complaint, however, does not allege that Lebow suffered any harm other than the loss of his job. Lebow does not, for instance, claim to have suffered emotional distress or other harms that should be compensated with money damages. Accordingly, the only monetary damages that he specifically requests are back pay, benefits, and punitive damages. Lebow's vague request for compensatory damages is not supported by any facts alleged in the complaint, and thus it is not sufficient to constitute a claim for legal relief. *See Lynch v. Pan American World Airways, Inc.*, 475 F.2d 764, 765 (5th Cir.1973). Lebow's failure to properly support his claim for compensatory damages, however, does not deprive him of the right to seek punitive damages. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1351–52 (7th Cir.1995) (under Title VII, a punitive damage award is proper even in the absence of compensatory damages when back pay is awarded); *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir.1989) (punitive damages are recoverable under 42 U.S.C. § 1983 even if no compensatory damages are awarded).

*Guidelines as a Model for Punitive Damage Reform,* 40 U.C.L.A.L.Rev. 753, 767 (Feb. 1993). In *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the Supreme Court stated that "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were [historically] issued by courts of law, not courts of equity." *Id.* at 422, 107 S.Ct. at 1838. Accordingly, the *Tull* Court held that an individual who was sued by the government under the Clean Water Act had a Seventh Amendment right to a jury trial to determine his liability for civil penalties authorized by the Act. *Id.* at 425, 107 S.Ct. at 1839–40.[12] Consequently, a few district courts have recognized that the question of whether a jury trial is available under the RLA is closely related to the question of whether a plaintiff may recover punitive damages. *See Freiburger v. Emery Air Charter, Inc.,* 795 F.Supp. 253, 261 (N.D.Ill. 1992); *Brady v. Trans World Airlines, Inc.,* 196 F.Supp. 504, 505 (D.Del.1961).

█ In holding that Lebow's request for punitive damages did not entitle him to a trial by jury, the district court relied on *Lynch v. Pan American World Airways, Inc.,* 475 F.2d 764 (5th Cir.1973), in support of the conclusion that a demand for punitive damages does not transform an equitable claim into a legal claim. *See also Hodges v. Virgin Atlantic Airways, Ltd.,* 714 F.Supp. 75, 77 (S.D.N.Y.1988). In *Lynch,* the court stated that a plaintiff may not state a legal claim by "making unsupported allegations for compensatory and punitive damages." *Lynch,* 475 F.2d at 765. We agree that if a plaintiff fails to plead facts that, if true, would entitle him to punitive damages, a frivolous demand for punitive damages will not transform an equitable claim into a legal claim. *Cf.* note 11, *supra.* Lebow, however, does not offer "unsupported allegations" as described in *Lynch;* rather, he properly alleges the type of intentional misconduct (firing him because he engaged in protected activity) for which punitive damages may be awarded. *Cf. Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 551 (7th Cir. 1991); *Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 112 (7th Cir.1990), *cert. denied,* 502 U.S. 812, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991). And since *Tull* implies that a properly supported claim for punitive damages raises a legal issue, whether the RLA allows Lebow to seek punitive damages bears heavily on the question of whether he is entitled to a jury trial.

In *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court held that when a right of action has been implied under a federal statute, the courts must "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Id.* at 66, 112 S.Ct. at 1032. Lebow argues that, under *Franklin,* we must presume that punitive damages are available under the RLA because Congress has not explicitly limited the remedies that a plaintiff may recover. ATA counters that the *Franklin* presumption does not apply to this case because (1) Congress has indicated that punitive damages are not recoverable under the RLA and (2) punitive damages are not appropriate under the RLA.

1.

█ First, ATA contends that Congress has indicated that punitive damages are not recoverable under the RLA. The text of the RLA is silent concerning what remedies are available when an employee sues his employer for discharging him because of his union-organizing activities. However, when a suit is brought under an implied right of action, we may also look to Congressional action taken after the cause of action was implied to determine what remedies are available. *See Franklin,* 503 U.S. at 72, 112 S.Ct. at 1036. In 1930, the Supreme Court held that an implied right of action exists under the RLA. *See Texas & N.O.R. Co. v. Brotherhood of Railway and Steamship Clerks,* 281 U.S. 548, 568–69, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930). In 1934, Congress amended the RLA

---

12. The statute allowed courts to impose civil fines of up to $10,000 per day for violations of the Act. *Id.* at 414, 107 S.Ct. at 1833–34. The *Tull* Court described these fines as punitive in nature. *See id.* at 422–24, 107 S.Ct. at 1838–39.

to include criminal penalties for interference with employees' right to organize. *See* 45 U.S.C. § 152 (Tenth). ATA argues that the addition of the criminal penalties demonstrates that Congress intended the Department of Justice, rather than individual plaintiffs, to seek punishment for violations of the RLA. We disagree. If anything, the 1934 amendments would appear to demonstrate that Congress sought to make more remedies (including more punitive-type remedies) available under the RLA rather than fewer. Thus, we cannot conclude that the addition of criminal penalties implies that Congress wished to preclude punitive damages in civil cases.

■ Moreover, in cases such as Lebow's where a *non-union* employee is suing his employer for wrongful discharge, the criminal sanctions authorized under § 152 may not even be available. Section 152 requires the Department of Justice to initiate a criminal prosecution if the *union* representing the carrier's employees reports the illegal conduct to the United States Attorney.[13] Section 152, however, does not provide individual employees with the right to petition the United States Attorney to bring a criminal prosecution. *See Belton v. Air Atlanta, Inc.,* 647 F.Supp. 28, 30 (N.D.Ga.1986). It may be arguable (although we need not decide the question today) that Congress wished the criminal penalties created by § 152 (Tenth) to be the exclusive means of punishment when employees are represented by unions. We do not believe, however, that § 152 (Tenth) was intended to prevent individual, unrepresented employees from seeking punitive damages from their employers for violations of the RLA.

ATA also argues that the *Franklin* presumption that all appropriate remedies are available does not apply because the RLA "expressly enumerate[s] the remedies available to plaintiffs." *Franklin,* 503 U.S. at 69 n. 6, 112 S.Ct. at 1034 n. 6; *cf. Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985). The RLA, however, does not enumerate the remedies available to employees suing for unlawful discharge. ATA notes once again that § 152 (Tenth) explicitly authorizes the United States Attorney to initiate a criminal prosecution, but criminal penalties are certainly not available in a civil suit brought under the implied right of action recognized in *Texas & N.O.R. Co.* Thus, *Franklin* does apply, and Lebow may seek "all appropriate remedies."

### 2.

■ Finally, ATA contends that punitive damages are not appropriate in suits under the RLA because they will upset the delicate balance of power between employers and employees. The over-arching goal of the federal labor laws is to achieve industrial peace, improve wages, and improve working conditions "by fostering a system of employee organization and collective bargaining." *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967); *see also International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979). ATA believes that allowing punitive damages would disrupt the collective bargaining process by shifting the balance of power too far in favor of employees.

In *Foust,* the Supreme Court held that an employee suing a union under the RLA for breach of the duty of fair representation may not collect punitive damages. *Foust,* 442 U.S. at 52, 99 S.Ct. at 2127–28. The Court stated that allowing punitive damages would "impair[ ] the effectiveness of unions as collective-bargaining agents" and "curtail the broad discretion that [the Supreme Court

---

**13.** Section 152 (Tenth) states in relevant part:

It shall be the duty of any United States Attorney to whom *any duly designated representative of a carrier's employees* may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States, all necessary proceedings for the enforcement of the provisions of this section, and for the punishment of all violations thereof.

45 U.S.C. § 152 (Tenth) (emphasis added). The RLA defines "representative" as "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C. § 151. Accordingly, the "duly designated representative of a carrier's employees" is any union or other entity chosen by the employees to represent them.

has] ... afforded unions in handling grievances." *Id.* at 51, 99 S.Ct. at 2127. Therefore, the Court held that providing employees the right to seek punitive damages in a fair representation suit against a union does not comport with national labor policy. *See id.* at 52, 99 S.Ct. at 2127–28.

■ An unlawful discharge suit by an unrepresented employee against his employer, however, is quite different from a fair representation suit by a union employee against his union. Awarding punitive damages to non-union employees would not interfere with the collective bargaining process because there is no collective bargaining process with which to interfere. On the contrary, if an employer discharges an employee for attempting to organize a union, it is the employer that is interfering by chilling union activity. An employee in such a situation cannot appeal to a union for help; his recourse is to file an individual suit, as Lebow did. It is possible that if the only sanctions available are remedies such as reinstatement and back pay, employers may not be sufficiently deterred from inappropriately discharging union organizers. *See Kemezy v. Peters,* 79 F.3d 33, 34 (7th Cir.1996) ("[P]unitive damages are [sometimes] necessary ... in order to make sure that tortious conduct is not under-deterred."). Accordingly, a number of district courts (including the court below) have held that the RLA allows an unrepresented employee to recover punitive damages in an unlawful discharge suit

against his employer. *See Riley v. Empire Airlines, Inc.,* 823 F.Supp. 1016, 1022–23 (N.D.N.Y.1993); *Freiburger v. Emery Air Charter, Inc.,* 795 F.Supp. 253, 260 (N.D.Ill. 1992); *Belton v. Air Atlanta, Inc.,* 647 F.Supp. 28, 32 (N.D.Ga.1986); *Brown v. World Airways, Inc.,* 539 F.Supp. 179, 181 (S.D.N.Y.1982); *see also International Assn. of Machinists v. Jet America Airlines, Inc.,* 115 L.R.R.M. (BNA) 3283, 1983 WL 31130, *2 (C.D.Cal.1983).[14] Therefore, because there would be no interference with the collective bargaining process, we hold that an unrepresented employee may seek punitive damages against his employer in an unlawful discharge action under the RLA.[15]

### III.

■ In sum, Lebow's claim is similar to common-law tort and contract actions, and he has the right to seek punitive damages, which the Supreme Court has characterized as a legal remedy. Thus, Lebow raises a legal claim, and the Seventh Amendment guarantees his right to a trial by jury. In addition, because ATA would not have been entitled to judgment as a matter of law, the district court's error in denying him a jury trial was not harmless. Accordingly, we must remand the case for a jury trial. To the extent that Lebow seeks both legal and equitable relief, the jury shall impose any legal relief, while the judge shall impose any equitable relief. *See Lytle v. Household*

14. In *Maas v. Frontier Airlines, Inc.,* 676 F.Supp. 224 (D.Colo.1987), the court held that a plaintiff could not recover punitive damages in an unlawful discharge suit under the RLA. *Id.* at 226–27. The *Maas* court, however, did not state whether the plaintiff was a union member, nor did it discuss the distinction between represented and unrepresented employees. In addition, in *Brotherhood Railway Carmen v. Delpro Co.,* 579 F.Supp. 1332 (D.Del.1984), the court held that union members may not recover punitive damages against their employer in a suit under the RLA for failing to bargain in good faith and unilaterally changing the conditions of their employment. *Id.* at 1337. The court reasoned that allowing punitive damages in such situations would interfere with the collective bargaining process. *Id.* at 1335–37. We do not decide whether union members may seek punitive damages in suits under the RLA.

15. Because we hold that Lebow has the right to seek one form of legal relief (punitive damages), a jury trial is necessary, and we need not decide whether the other relief sought (reinstatement with back pay and benefits) qualifies as legal or equitable. *See NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48–49, 57 S.Ct. 615, 629–30, 81 L.Ed. 893 (1937) (back pay is incident to reinstatement and thus need not be awarded by a jury); *Atlas Roofing Co. v. Occupational Safety and Health Review Comm.,* 430 U.S. 442, 453 n. 10, 97 S.Ct. 1261, 1268 n. 10, 51 L.Ed.2d 464 (1977) (leaving open question of whether right to jury trial exists in suit seeking back pay but not reinstatement); *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 746–50 (D.C.Cir.) (suit for back pay and reinstatement: depending on nature of award, back pay may be legal relief and right to jury trial on back pay claim would exist), *cert. denied,* —— U.S. ——, 116 S.Ct. 180, 133 L.Ed.2d 118 (1995).

*Mfg., Inc.,* 494 U.S. 545, 550–52, 110 S.Ct. 1331, 1335–37, 108 L.Ed.2d 504 (1990). The jury, however, decides common issues of fact, and the jury's factual findings are binding on the judge. *See id.; Dombeck v. Milwaukee Valve Co.,* 40 F.3d 230, 236 (7th Cir.1994). The judgment of the district court is RE-VERSED, and the case is REMANDED for a jury trial.