**Ron JOHNSON, Plaintiff–Appellant,**

v.

**EXPRESS ONE INTERNATIONAL, INC., Defendant–Appellee.**

**No. 90–1701.**

United States Court of Appeals,
Fifth Circuit.

Oct. 11, 1991.

---

Marvin Menaker, Menaker & Huffman, Dallas, Tex., for plaintiff-appellant.

John F. McCarthy, Jr. and M. Scott McDonald, Johnson, Bromberg & Leeds, Dallas, Tex., for defendant-appellee.

Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.

GOLDBERG, Circuit Judge:

We have previously held that an employee has a right under the National Labor Relations Act to have a co-worker present during an investigatory interview which the employee reasonably believes might result in disciplinary action. *Anchortank, Inc. v. NLRB*, 618 F.2d 1153, 1157 (5th Cir.1980) (citing *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 269 n. 1, 95 S.Ct. 959, 969 n. 1, 43 L.Ed.2d 171 (1975) (Powell, J., dissenting)). The question presented in this labor case is whether that right also arises under the Railway Labor Act.

## I.

Express One International, Inc. ("Express One") employed Ron Johnson ("Johnson") as a pilot for approximately two years until Express One fired him on June 9, 1988. Johnson and his co-workers were without union representation during his employ, and Johnson himself was under no written contract.

In April 1988, the Express One pilots selected a pilots' committee. Express One never recognized the pilots' committee as a representative of any bargaining unit to negotiate the terms and conditions of employment between Express One and its pilots. A member of the pilots' committee described the committee as a communication vehicle, not a collective bargaining or representative entity.

Johnson's termination from Express One's employ centered on events occurring in June 1988. On June 7, 1988, Johnson failed to appear at his designated work station in Seattle, Washington by the prearranged time. Apparently, Johnson's flight to Seattle had been cancelled earlier that day, but Johnson did not notify Express One that he would be late until approximately two hours after he was expected to report. Consequently, Express One was unable to arrange to have a pilot fill in for Johnson. Express One was forced to hire a private plane to fly Johnson to Seattle in time to complete his duties. This was the second time Johnson had failed to report on time or to notify Express One in a timely manner that he would be late.

The next day, Express One's management asked Johnson to meet with them in Dallas. En route to this meeting, Johnson contacted two members of the pilots' committee to request their presence and support at the meeting. Before and during the meeting, Johnson communicated to Express One his desire to have these two fellow employees and members of the pilots' committee present. Although Express One declined both these requests, Johnson continued to participate in the meeting in which he was questioned about his tardiness the previous day. Later that afternoon, Express One fired Johnson because of the events the previous day and the similar earlier incident.

Following his termination, Johnson filed this action for wrongful discharge under the Railway Labor Act, 45 U.S.C. §§ 152, 182. In his complaint, Johnson alleged that Express One wrongfully terminated his employment following the meeting with Express One management. He asserted that he was entitled under *NLRB v. J. Weingarten, Inc.* and *Anchortank, Inc. v. NLRB* to have the two members of the pilots' committee present at the investigatory meeting. The district court granted Express One's motion for summary judgment, concluding that Johnson was not entitled to have a representative at his inter-

view with Express One management when no union representative or collective bargaining unit had been elected by the employees or recognized by Express One.

## II.

Section 7 of the National Labor Relations Act ("the NLRA") provides that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of* collective bargaining or *other mutual aid or protection,* and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C.A. § 157 (West 1973) (emphasis added). The National Labor Relations Board ("the Board"), the agency charged by Congress with enforcement of the Act, has interpreted this section to provide that an employee's request for the presence of his collective bargaining representative at an interview which the employee reasonably fears may result in discipline is a protected activity. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 260–62, 95 S.Ct. 959, 965, 43 L.Ed.2d 171 (1975). The Supreme Court in *Weingarten* approved of this interpretation stating that "[t]he Board's holding is a permissible construction of 'concerted activities for ... mutual aid or protection.'" *Id.* at 260, 95 S.Ct. at 965. The Court reasoned that when an employee is represented by a union and requests the presence of a union representative at an investigative interview, that request is in and of itself concerted activity because "the union representative whose participation he seeks is ... safeguarding not only the particular employee's interest but also those of the entire bargaining unit." *Id.* at 260–61, 95 S.Ct. at 965.

In *Anchortank, Inc. v. NLRB,* 618 F.2d 1153 (5th Cir.1980), which also arose under the NLRA, this court held that the *Weingarten* right to representation only exists when a union representative has been elected. *Id.* at 1162. We reasoned that only after a union election is conducted does a non-employee representative serve a concerted group interest. However, we expressly limited our analysis to cases in which the requested representative was not a fellow employee: "[s]ection 7 protects concerted activity by employees, and one employee's request for the presence of another unit employee at an interview is concerted activity." *Id.* (citing *Weingarten,* 420 U.S. at 269 & n. 1, 95 S.Ct. at 969 & n. 1 (Powell, J., dissenting)); *see also ITT Lighting Fixtures v. NLRB,* 719 F.2d 851, 855 (6th Cir.1983) (construing *Anchortank* as making a specific exception for request for fellow employee representation in a nonunion setting).

Since *Anchortank* was decided, the NLRB has held that the *Weingarten* rule should not apply in a nonunion context to a request for representation by a fellow employee. *See Slaughter v. NLRB,* 876 F.2d 11, 13 (3rd Cir.1989) (holding that Board's interpretation of section 7 declining to extend *Weingarten* rule to nonunion setting was reasonable). In *Slaughter,* the petitioner worked for the DuPont company at a nonunion facility. When a supervisor asked to meet with him, the employee stated that he would only attend the meeting if a fellow employee was also allowed to attend. The supervisor denied his request, and the employee refused to attend the meeting; he was subsequently suspended indefinitely. *Id.* at 11–12. The Board initially held that the employee's discharge violated section 7 under the principle of *Weingarten,* but later changed its view and dismissed the employee's unfair labor practices charge against his employer, holding that the *Weingarten* rule should not be extended to nonunion employees. *Id.* at 13.

The Third Circuit upheld the Board's decision that, absent an exclusive collective bargaining representative, an employer may discipline an employee who conditions his willingness to discuss potential discipli-

nary matters on the presence of a fellow employee of his choosing. *Id.* According to the Third Circuit, the Board's conclusion that *Weingarten* should not extend to a nonunion employee's request for the presence of another unit employee at an investigatory interview represented a reasonable construction of section 7 of the NLRA. In enforcing the Board's order, however, the court observed that a contrary construction of section 7 could be equally reasonable. *Id.* Indeed, the court, in two of its earlier opinions reviewing the Board's original decision, upheld the Board's contrary interpretation—that *Weingarten* should be extended to protect a nonunion employee's right to attend an investigatory interview in the company of a co-worker. *See Slaughter v. NLRB,* 794 F.2d 120, 122 (3d Cir.1986) (rejecting the Board's contention that section 7 "*compels* the conclusion that nonunion employees do not enjoy the rights recognized in the *Weingarten* decision" and "reaffirm[ing its] previous view that under the reasoning of *Weingarten* it is at least permissible to interpret § 7 as guaranteeing union members and unorganized employees alike the right to a representative at investigatory interviews") (referring to *E.I. DuPont de Nemours & Co. v. NLRB,* 724 F.2d 1061, 1065–66 (3d Cir. 1983), *vacated,* 733 F.2d 296 (3d Cir.1984)).

Although the Board, upon further reflection, is now of the view "that *Weingarten* 'should not' be extended to non-union employees," *Slaughter,* 876 F.2d at 13, and the Third Circuit has concluded that such an interpretation is a reasonable one, that interpretation is not *compelled* by the language of section 7. *Slaughter,* 794 F.2d at 122. Indeed, the language of section 7 supports the view we expressed in *Anchortank,* that a nonunion employee is entitled to the company of his co-worker at an investigatory interview. *See Slaughter,* 794 F.2d at 128; *see also* Charles J. Morris, *NLRB Protection in the Nonunion Workplace: A Glimpse at a General Theory of Section 7 Conduct,* 137 U.Pa.L.Rev. 1673, 1750 (1989) ("When one employee agrees to stand by another employee when the latter is being interrogated about matters that could lead to discipline, concerted activity

for mutual aid or protection in its most basic form is being provided."); Steve Carlin, Note, *Extending Weingarten Rights to Nonunion Workplace,* 86 Colum.L.Rev. 618, 624 (1986) ("The request of an unrepresented employee for the assistance of a co-worker is of the 'same nature' [as a represented employee's request for a union representative]. Under section 7, therefore, the Board must recognize the nonunion *Weingarten* right."). Thus, it would appear that section 7 of the NLRA is susceptible to two equally reasonable, though diametrically antagonistic, interpretations.

Johnson seizes upon our interpretation of section 7 in *Anchortank* to muster support for his claim that Express One unlawfully terminated his employment. He asserts that Express One's refusal to allow the presence of a co-worker at the investigatory interview is an unlawful labor practice under our, and Supreme Court, precedent. Express One contends that we should defer to the Board's most recent interpretation of the NLRA in *Slaughter* because the Board is best equipped to determine what is a reasonable interpretation of section 7 of the NLRA.

### III.

*Weingarten, Anchortank,* and *Slaughter* arose under the NLRA, and therefore, those decisions, though instructive, do not necessarily inform the question presented in this case: whether the Railway Labor Act ("the RLA") provides the nonunion employee with the right to be accompanied to an investigatory interview by a co-worker. The RLA, not the NLRA, governs employer/employee relations with respect to common carriers by air, like Express One. *See* 45 U.S.C.A. §§ 181, 182 (1986) (extending relevant provisions of the RLA to air carriers "engaged in interstate or foreign commerce ... and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers"); *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969) (noting that the NLRA specifically exempts from its coverage employers

and employees subject to the RLA). The Supreme Court has observed that "carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA," *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 433, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989), yet the Court has also cautioned against transplanting NLRA precedent into the railway labor arena in wholesale fashion. *Jacksonville Terminal Co.,* 394 U.S. at 383, 89 S.Ct. at 1118. NLRA precedent may serve as a prognostic interpretive tool, but we should be especially circumspect to engraft NLRA precedent into the railway labor context where, as here, the statutory language of the RLA differs substantially from section 7 of the NLRA. *Id.; cf. Balzeit v. Southern Pacific Transportation Co.,* 569 F.Supp. 986, 988 n. 5 (N.D.Cal.1983) ("where ... the question presented does not require statutory interpretations that are unique to the particular mechanics of the RLA a court may refer to the NLRA for assistance in construing the RLA"). Thus, although the NLRA is a willing donor of its caselaw and analogies, the RLA is not always a compatible recipient.

Section 2 Fourth, the relevant provision of the RLA, provides that:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for

any carrier to interfere in any way with the organization of its employees....[1] 45 U.S.C.A. § 152 Fourth (West 1986). Conspicuously absent from this provision is that language, present in section 7 of the NLRA, which confers upon employees the right "to engage in other concerted activities for the purpose of ... other mutual aid or protection." 29 U.S.C.A. § 157 (West 1973). The omission of that language is critical because the rule of *Weingarten* and *Anchortank* is grounded upon it. *See Weingarten,* 420 U.S. at 260, 95 S.Ct. at 965 ("The Board's holding is a permissible construction of 'concerted activities for ... mutual aid or protection.' "); *id.* at 268–69, 95 S.Ct. at 969 (Powell, J., dissenting) (observing that the majority construed "the right 'to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection' ... to include union representation or the presence of another employee" at an investigatory interview); *Anchortank,* 618 F.2d at 1157 ("one employee's request for the presence of another unit employee at an interview is concerted activity"); *see also Slaughter,* 794 F.2d at 126 ("We think it is plain beyond cavil that the *Weingarten* right is rooted in § 7's protection of concerted activity, not § 8(a)(5)'s guarantee of the right to bargain collectively."). In all other respects, section 7 of the NLRA and section 2 Fourth of the RLA are congruent: both provide employees with the right to join or organize a labor organization and "bargain collectively through representatives of their own choosing." *Compare* 29 U.S.C. § 157 *with* 45 U.S.C. § 152 Fourth.[2]

We believe the absence of the explicit right "to engage in other concerted activities for the purpose of ... other mutual aid or protection" in the RLA proves fatal to Johnson's claim. If, as the Third Circuit has suggested, the presence of that lan-

---

**1.** Representative is defined as "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C.A. § 151 (West 1986).

**2.** Section 2 Fourth of the RLA also states that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the

purposes of this chapter." 45 U.S.C. § 152 Fourth. That clause does not help Johnson because the majority of pilots did not select a representative to act for them. The pilots' committee merely served as a means of communication with the pilots who were oftentimes absent from the principal place of business; it did not serve in a representative capacity.

guage in the NLRA does not *compel* the extension of *Weingarten* to the nonunion setting, then surely its omission from the RLA makes the extension of *Weingarten* to the railway labor arena even less compelling. Neither the right to "organize and bargain collectively through representatives of their own choosing," nor the right to "join, organize, or assist in organizing the labor organization of their choice," 45 U.S.C. 152 Fourth, encompasses the right of a nonunion employee to have a co-worker present during an investigatory interview. To be sure, the National Labor Relations Board, the Supreme Court, and our court have never indicated that section 7 of the NLRA would sustain the *Weingarten* rule absent the explicit right to "engage in other concerted activities for the purpose of ... other mutual aid or protection." In our view, this latter clause of section 7, not present in the RLA, underpins the concomitant right to have a co-worker present at an investigatory interview under the RLA.

A comparison of the stated purposes of the NLRA and the RLA buttresses our conclusion. The NLRA protects:

> the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment *or other mutual aid or protection.*

29 U.S.C.A. § 151 (West Supp.1991) (emphasis added). The RLA, in contrast, expresses no reciprocal congressional intent. Its purpose, in relevant part, is "to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization." 45 U.S.C.A. § 151a (West 1986). There is no mention of "other concerted activities" or "mutual aid or protection" anywhere in the RLA.

The Supreme Court has commented that:

> Section 2 Fourth was enacted as part of the 1934 amendments to the RLA. 48 Stat. 1185. From the time of our very first opportunity to interpret the 1934 amendments, we have viewed them as

addressing primarily the precertification rights and freedoms of unorganized employees. In *Virginian R. Co. v. Railway Employees,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), we observed that the employees' freedom "to organize and to make choice of their representatives without the 'coercive interference' and 'pressure' of a company union ... was continued and made more explicit by the amendment of 1934.... [T]he 1934 Act was directed particularly at control over the initial step in collective bargaining—the determination of the employees' representatives." [*Switchmen's v. National Mediation Bd.,* 320 U.S. 297] at 317, 64 S.Ct. [95] at 105 [88 L.Ed. 61 (1943)] (Reed, J., dissenting)....

*Trans World Airlines,* 489 U.S. at 440–41, 109 S.Ct. at 1234. Quite plainly, the RLA protects the employees' right to establish a union. *See Herring v. Delta Air Lines, Inc.,* 894 F.2d 1020 (9th Cir.1990) ("No private cause of action exists under the RLA for a group of employees who assert retaliatory conduct based upon employee activities which bear no relationship to establishing a union, or to employer activities that bear no relationship to undermining a union."), *cert. denied,* — U.S. —, 110 S.Ct. 1319, 108 L.Ed.2d 495 (1990). We find no indication that the RLA seeks to preserve employees' rights to act in concert for "mutual aid or protection." Thus, no basis exists, and indeed Johnson offers none, for inferring a right to have a co-worker attend an investigatory interview from the RLA. Such a right would do little to effectuate the goal of the RLA—allowing employees to organize or join a labor organization of their choice—and finds no support in the statutory language.

### IV.

A brief history lesson reminds us that at the time of the enactment of the Railway Labor Act in 1926, the brotherhoods of various working departments of railroads were quite thoroughly organized. Congress enacted the RLA "to bring about stable relationships between labor and management in this most important national industry" so to avoid disputes threaten-

ing the disruption of transportation. *Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R.*, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). The atmospherics at the time of the birth of the NLRA were quite different. Congress enacted the National Labor Relations Act in 1935, at a time when labor had not yet achieved a comparable level of organization. Thus, when the NLRA came on the scene, unions were just beginning to develop their muscularity, and Congress sought to provide for more intensive union representation and employee rights. That the NLRA may give nonunion employees some added muscle over the RLA scheme merely reflects this historical fact.

The judgment is AFFIRMED.