**Stewart W. BECKETT, Jr., Plaintiff,**

v.

**ATLAS AIR, INC., Defendant.**

**No. CV 95–480(RJD).**

United States District Court,
E.D. New York.

June 24, 1997.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Leon Rosenblatt, West Hartford, CT, for Plaintiff.

J. Robert Kirk, Douglas W. Hall, Verner, Liipfert, Bernhard, McPherson and Hand, Washington, DC, Mary E. Flynn, Morrison, Cohen, Singer & Weinstein, New York City, for Defendant.

## MEMORANDUM & ORDER

DEARIE, District Judge.

In August 1994, plaintiff Stewart Beckett ("Beckett") was terminated from his employment as a pilot for defendant Atlas Air, Inc. ("Atlas") on grounds of insubordination. Beckett claims he was fired for engaging in collective bargaining activities protected by the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* (the "RLA").[1] Atlas has moved for summary judgment.

Before working for Atlas, Beckett had been employed for many years by Pan American World Airways, but lost his job when that airline sought protection of the bankruptcy laws. In January, 1993, he was hired

1. The RLA applies not only to rail carriers, but also to "carriers by air" and their employees. See 45 U.S.C. §§ 181–182.

by Atlas, then a new cargo airline. At the time of Beckett's employment and termination, Atlas' flight crews were not unionized. Beckett, a longtime union supporter, had been elected by a group of employees to represent them in discussions with management regarding the terms and conditions of their employment. It is undisputed that this group was composed of a minority of Atlas crew members; thus, Beckett could not have been considered the official collective bargaining representative of all crew members. Nevertheless, Beckett met with Atlas management representatives a number of times in 1994, allegedly to discuss issues relating to employment conditions.

■ Throughout most of 1994, the International Brotherhood of Teamsters (the "IBT") was attempting to organize crew members at Atlas. Beckett, meanwhile, was engaged in what he describes as "collective bargaining" efforts on behalf of his non-unionized co-workers. Management claims it was concerned that any perceived support of Mr. Beckett's efforts could subject it to charges of "sponsoring" an in-house union while the IBT was attempting to organize Atlas employees. The RLA, like the National Labor Relations Act (the "NLRA"), requires an employer to maintain "laboratory conditions" during a union election campaign. Otherwise, if a union garners enough support to demand an election and then loses, it can petition the National Mediation Board (the "NMB") to overturn the election results based on the employer's "sponsorship" of a rival collective bargaining representative

during the election campaign. See 45 U.S.C. § 152, Ninth.[2] In such cases, the NMB can order a second election, conducted under special conditions whereby a union can be certified *without* the support of a majority of eligible voters.[3]

In light of these concerns, Atlas claims it scheduled a meeting with Beckett on July 26, 1994, for the purpose of explaining that he was not to represent to other employees that he was in any way engaged in collective bargaining with the company. Beckett claims he believed the purpose of the meeting was to continue discussions regarding employee grievances and certain conditions of employment. He now describes the meeting as a "set up," in that Atlas had invited its labor counsel to be present. According to Atlas, Beckett was clearly instructed that it would be "intolerable" for him to represent or imply in any way that he was authorized to bargain collectively with management as an employee representative. These instructions were repeated in follow-up correspondence from Atlas' counsel.

Atlas claims that after the meeting, Beckett contacted other crew members to announce his collective bargaining "successes" at the July 26 meeting. Atlas describes Beckett as somewhat delusional and self-important, experiencing the meeting not as an admonishment but as an important bargaining session filled with significant accomplishments on behalf of his co-workers. On August 4, 1994, Atlas fired Beckett when he returned from a vacation, citing his "insubor-

---

**2.** Section 2, Ninth of the RLA empowers the NMB to adjudicate disputes regarding union elections. 45 U.S.C. § 152, Ninth. Although the NMB is not empowered to rule on claims of unlawful discharge under Section 2, Fourth, on which plaintiff relies for this action, it can examine wrongful discharge claims to the extent they impact on the conduct of a union election. *See Continental Airlines*, 21 N.M.B. 229, 252 (1994).

**3.** Normally, the NMB will certify a union as the authorized collective bargaining representative of a group of employees only after an election in which a majority of *eligible* employees votes in favor of some form of union representation. *See Zantop Int'l Airlines, Inc. v National Mediation Bd.*, 544 F.Supp. 504, 505 (E.D.Mich.1982), *aff'd*, 732 F.2d 517 (6th Cir.1984). However, where the pre-election campaign is marred by signifi-

cant employer interference in employees' freedom independently to choose (or reject) union representation, the NMB has, in some cases, ordered a second election to be conducted by mail ballot, whereby a majority of votes *cast* controls the outcome. *See Virginian Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515, 540, 57 S.Ct. 592, 595–96, 81 L.Ed. 789 (1937) (RLA Section 2, Fourth does not require that representatives be selected by majority of *eligible* voters). These remedial polls are often called *Laker* elections or *Key* elections, after the NMB decisions in *Laker Airways, Ltd*, 8 N.M.B. 236 (1981) and *Key Airlines*, 13 N.M.B. 153 (1986). The Court notes, however, that in each of those seminal cases, the employer's conduct involved multiple acts of interference more egregious than those alleged here.

dination" in the aftermath of the July 26 meeting. After management read a letter to Beckett's co-workers explaining the termination, Beckett filed this action, alleging wrongful termination and defamation.

After Atlas filed a motion to dismiss the complaint, this Court dismissed the defamation claim by Memorandum and Order dated August 14, 1995. 1995 WL 498703 (E.D.N.Y. Aug.14, 1995). The Court ruled, however, that an implied private right of action does exist for violation of pre-certification employee rights created by the RLA, and refused to dismiss the wrongful discharge claim. Atlas now moves for summary judgment on the wrongful discharge claim or, in the alternative, for an order: (a) awarding Atlas partial summary judgment on Beckett's claim for lost wages, in that Federal Aviation Administration ("FAA") regulations would have required his disqualification as a pilot less than two years after his termination, upon his sixtieth birthday; (b) striking the demand for punitive damages; and (c) striking the jury demand. For the reasons articulated below, defendant's motion is denied in all respects.

### DISCUSSION
#### I. SUMMARY JUDGMENT

■ The NLRA does not apply to employers subject to the RLA, 29 U.S.C. § 152(2) (defining "employer" for NLRA purposes), but many of the cases which do address RLA wrongful discharge claims have adopted standards analogous to those employed in similar cases under the NLRA. *See, e.g., Lebow v. American Trans Air, Inc.,* 86 F.3d 661, 665–66 (7th Cir.1996) (applying NLRA standard in RLA wrongful discharge action); *Schlang v. Key Airlines, Inc.,* 794 F.Supp. 1493, 1498 (D.Nev.1992), *vacated in part on other grounds,* 158 F.R.D. 666 (D.Nev.1994). Under those standards, which the Court will apply in this case, a wrongful termination plaintiff must demonstrate: (a) he was engaged in activity protected by the RLA; (b) defendant was aware of that activity; (c) defendant harbored animus toward the protected activity; and (d) the animus was a causal factor in plaintiff's termination. *See Carry Cos. of Ill., Inc. v. NLRB,* 30 F.3d 922, 927 (7th Cir.1994). This framework has been

developed in cases under Section 8(a)(3) of the NLRA, which makes it an unfair labor practice to "discriminate in regard to ... tenure of employment ... to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

As this Court stated in its August 14, 1995 Memorandum and Order, the RLA does not explicitly provide a private right of action for wrongful discharge. Rather, the statute creates an administrative scheme requiring parties to collective bargaining agreements in the airline and railway industries to submit disputes to prescribed methods of dispute resolution before resorting to strikes or other forms of self-help. Since these mechanisms are not available to non-unionized employees, this Court and others have concluded that a private right of action exists for such employees for violations of the rights provided them by the RLA. See Aug. 14, 1995 Memorandum & Order, at 3–4, 1997 WL 498703, at *2 (citing additional cases).

*Burdens of Proof and Production*

The parties disagree on the analytical approach the Court should take in assessing Beckett's claim. Atlas urges the Court to apply a burden-shifting approach similar to that articulated by the Supreme Court for cases arising under Title VII of the Civil Rights Act of 1964, as amended. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (once plaintiff makes *prima facie* showing, burden shifts to employer to *produce* a non-violative reason for discharge; burden then shifts back to employee to show employer's justification is pretextual; ultimate burden of proof on all issues remains with employee); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (same). Beckett, on the other hand, claims that in the labor context, a pure burden-shifting analysis is appropriate: once a *prima facie* showing is made, the burden of *proof* (not just production) shifts to the employer to demonstrate that an illegal motive played no part in the termination decision. Both parties rely on the seminal case of *Wright Line, a Div. of Wright Line, Inc.,* 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced, NLRB v. Wright*

*Line,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

In *Wright Line,* the National Labor Relations Board (the "NLRB") reformulated the burden of proof applicable to NLRA wrongful termination cases, holding that the NLRB General Counsel, acting as complainant, has the burden of proving, among the other elements of its case, that anti-union animus contributed to the employee's termination. If the General Counsel meets this burden, the employer nevertheless can avoid liability by showing, by a preponderance of the evidence, that the termination would have occurred regardless of the employee's participation in protected activities. See *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983) (summarizing *Wright Line*). The First Circuit, in reviewing the NLRB's *Wright Line* decision, held that it is improper to place such a heavy burden on the employer. 662 F.2d at 904. The court ruled that an employer cannot be required to *prove* that the termination would have occurred on legitimate grounds, but may be required to *produce* evidence sufficient to rebut the presumption of wrongfulness created when the General Counsel has demonstrated that an unlawful discharge has occurred. *Id.* The court did not apply *Burdine* 's burden shifting approach, as Atlas implies. Rather, it simply noted an analogy between its analysis and that Title VII case, in that, under *Burdine,* employers are given a burden of *producing* a legitimate reason for the discharge, while the burden of *proof* remains at all times with the complainant. *Id.* at 907.[4]

In *Transportation Management,* the Supreme Court affirmed the NLRB's approach, rejecting the First Circuit's criticisms. 462 U.S. at 401–04, 103 S.Ct. at 2474–76. The Court interpreted the NLRB's paradigm as creating something in the nature of an affirmative defense for employers found to have committed unlawful terminations. That is, the charging party has the burden of proving its *prima facie* case; if this burden is met, the employer can avoid liability by showing, by a preponderance of the evidence, that the termination, though motivated by anti-union animus, would have occurred on other grounds regardless of the employee's protected activities. *Id.*

In *Director v. Greenwich Collieries,* 512 U.S. 267, 275–79, 114 S.Ct. 2251, 2257–58, 129 L.Ed.2d 221 (1994), the Supreme Court clarified *Transportation Management* in light of section 7(d) of the Administrative Procedure Act, 5 U.S.C. § 556(d), which provides that the proponent of an order must bear the burden of proof. While correcting a statement in *Transportation Management* regarding application of section 7(d), the Court reaffirmed the earlier ruling. That is, under *Wright Line,* the charging party bears the burden of proof on its affirmative case, while the employer bears a similar burden on its affirmative defense. *Id.; see Southwest Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1339–40 (D.C.Cir.1995).

■ Thus, if Beckett's claim were stated under the NLRA, the Court would properly reject Atlas' invitation to apply a *Burdine*-type burden shifting paradigm. Neither party has cited, nor has the Court located, a case indicating the result should be any different under the RLA. Faced with a similar claim, the Seventh Circuit has ruled that "the same burden-shifting method employed in unlawful discharge claims under the [NLRA] applies to claims brought under the RLA." *Lebow,* 86 F.3d at 665–66. The Court concludes that the proper approach to the parties' burdens of proof in this RLA wrongful discharge action is that announced by the NLRB in *Wright Line* and discussed by the Supreme Court in *Transportation Management.* That is, Beckett has the burden of proving each element of his *prima facie* case. If he succeeds, Atlas may nevertheless avoid liability if it can prove an affirmative defense by a preponderance of the evidence.

The *Wright Line* framework has been created for what the NLRB calls "mixed motive" or "dual motive" cases—where an employee claims he was fired in retaliation for

---

4. The Second Circuit also rejected the NLRB's *Wright Line* formulation, in a decision later vacated by the Supreme Court in light of *Transpor-* *tation Management. See NLRB v. New York Univ. Med. Ctr.,* 702 F.2d 284 (2d Cir.), *vacated,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 73 (1983).

union organizing or activism and the employer proffers some alternate basis for the termination. *Holo–Krome Co. v. NLRB*, 954 F.2d 108, 110 (2d Cir.1992). Atlas argues, however, that this is not a "dual motive" case, but a "pretext" case. "Pretext" cases arise where the employer claims the termination was based solely on legitimate grounds which the complainant sees as a pretext for anti-union animus. In "dual motive" cases, the employer may acknowledge that protected activities were a factor in its decision, but argues that the employee would have been terminated on other grounds in any event. *Id.* The NLRB does not distinguish between the two in applying its *Wright Line* analysis, *see id.* at 110–13 (describing this failure to distinguish as a source of judicial confusion); *Wright Line*, 1980 NLRB LEXIS 939, at *4 ("there is no real need to distinguish between pretext and dual motivation cases"). Thus, the *Wright Line* analysis applies regardless of whether this is seen as a "dual motive" or a "pretext" case.

To a great extent, this case revolves around whether Beckett's activities were in fact "protected." Atlas' proffered ground for the termination is Beckett's allegedly insubordinate refusal to desist from claiming he was engaged in "collective bargaining" activities. If Beckett was in fact engaged in RLA-protected activities, Atlas could no more terminate him for announcing those activities than for engaging in them. On the other hand, if his activities were not protected, then Beckett's termination cannot give rise to a wrongful discharge claim under the RLA. Thus, it is not centrally relevant at this juncture whether Atlas' burden to support an alternative theory of Beckett's termination is one of production or persuasion.

*Protected Activities*

The primary question at this juncture is whether Beckett was engaged in protected activities. Section 2, Fourth of the RLA, on which Beckett relies, states in relevant part that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing ... No carrier ... shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice ..." 45 U.S.C. § 152, Fourth.

The parties dispute whether the rights created by this section are coextensive with those enjoyed by employees under the NLRA; that is, they dispute the scope of the activities protected by the RLA. Atlas claims that, in the context of a pre-certification (*i.e.,* non-union) employer-employee relationship, the RLA prohibits only employer interference with its employees' choice of representatives. In general, according to Atlas, the scope of protected activities is narrower under the RLA than the NLRA, and the RLA protects "concerted activities" related to employment conditions only to the extent they relate to union organizing. Atlas' position is that Beckett was not organizing a union *per se,* and so his acts were not protected. In fact, Atlas claims that to engage him would have been to interfere with his co-workers' ability to choose (or reject) the IBT as their bargaining representative. More to the point, it claims the perception of such interference could have exposed Atlas to election challenges from the IBT.[5] Beckett clearly was opposed to the IBT campaign and, according to Atlas, felt he could not lead an in-house union because his job entailed certain supervisory responsibilities which could have created a conflict of interest with a role in union leadership.

---

5. The Court notes that certain NMB decisions appear to support Atlas' concern that employer support of a rival bargaining group during an election campaign could, at least in combination with other factors, lead the NMB to find that the "laboratory conditions" required for an election were "tainted." However, the NMB may require a finding of " 'systematic' efforts to interfere with an election" before it will overturn the results of an election. *See Evergreen Int'l Airlines*, 20 N.M.B. 675, 706 (1993) (quoting *Northwest Airlines*, 19 N.M.B. 94 (1991)). The NMB

has stated that, for example, employer support of employee bargaining committees will not automatically warrant the avoidance of election results. *Continental Airlines*, 21 N.M.B. 229, 253–54 (1994) (quoting *Metroflight*, 18 N.M.B. 532, 544 (1991)). In *Metroflight*, the NMB found that specific employer encouragement, during an election campaign, of an employee bargaining committee, in combination with other acts, "interfered with ... employees' freedom of choice." 18 N.M.B. at 544.

■ Beckett claimed initially that the RLA protects "concerted activity" as broadly as does the NLRA, but seems to have backed away from that position at oral argument before the Court. In any event, the Court concludes that Section 2, Fourth protects a narrower range of activities in the pre-certification context than does section 7 of the NLRA.

Section 7 of the NLRA broadly announces the rights of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection* ... " 29 U.S.C. § 157 (emphasis added). Section 8(a) then delineates those employer activities which constitute unfair labor practices, *i.e.*, which violate the employee rights guaranteed by Section 7. Section 2, Fourth of the RLA, quoted above, does not contain analogous language regarding "other concerted activities," and a number of courts have held, therefore, that its protections are not as broad.

For example, in *Johnson v. Express One Int'l. Inc.*, 944 F.2d 247 (5th Cir.1991), the court found that the RLA does not entitle a non-union employee to have a co-worker present at an investigatory interview. Under the NLRA, the court found, that right emanates from the "other concerted activities for the purpose of ... other mutual aid or protection" language of Section 7. *Id.* at 251. Other than the "conspicuous omission" of this language, the court noted, the employee-rights provisions of Section 7 and Section 2, Fourth are "congruent." *Id.*

The Second Circuit has also weighed in in favor of a more limited reading of the RLA. In *Independent Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 141 n. 2 (2d Cir.1986), the court rejected a union's "effort to avoid [RLA] statutory and case law by urging that its rights be construed with reference to the broader judicially cognizable rights created by the Labor Management Relations Act." The court noted that "the general restriction on the scope of the [RLA] to organizing and representational rights, as opposed to the broader 'concerted activity' rights under the [NLRA], is clearly supported by the legislative history." *Id.*

In *Rachford v. Evergreen Int'l Airlines, Inc.*, 596 F.Supp. 384, 386 (N.D.Ill.1984), an airline employee had been terminated after reporting aircraft safety concerns to the FAA and repeatedly complaining to management about certain safety problems. The employee claimed, among other things, that reporting employees' joint safety concerns to management was a protected activity, and that his termination therefore violated the RLA. The court dismissed his claim, concluding that the RLA "does not cover concerted activities unrelated to union organizing." *Id.*

Similarly, *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir.), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1319, 108 L.Ed.2d 495 (1990), cited by Atlas, states that "[n]o private cause of action exists under the RLA for ... employees who assert retaliatory conduct based upon employee activities which bear no relationship to establishing a union, or to employer activities that bear no relationship to undermining a union." *Id.*

*Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 614 F.Supp. 1020, 1041–42 (N.D.Ill.), *amended,* 616 F.Supp. 849 (N.D.Ill. 1985), *aff'd in part, rev'd in part,* 802 F.2d 886 (7th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), is the only case cited by either party which might support the contention that the scope of protected activities is as broad under the RLA as under the NLRA. There, the court ruled that Section 2, Fourth of the RLA should not be construed more narrowly than section 8(a)(3) of the NLRA, and that cases interpreting the latter statute "may be applied, by analogy" to RLA actions. Although Section 2 Fourth "literally address[es] only union 'membership,' " the court stated that the statute "is broadly construed to protect a wide range of union-related activity." *Id. United* is a post-certification case, however, and to the extent the court's analysis of this issue is limited to the post-certification context, it is not necessarily inconsistent with the cases discussed above.

Beckett also points to a footnote in a dissenting opinion in *Trans World Airlines, Inc.*

*v. Independent Fed'n of Flight Attendants*, 489 U.S. 426, 445 n. 1, 109 S.Ct. 1225, 1236 n. 1, 103 L.Ed.2d 456 (1989). There, Justice Brennan referred to an earlier finding by the Court "that § 2 Fourth is 'comparable' to § 7 of the NLRA, which protects the right to engage in protected activities." *Id.* at 445 n. 1, 109 S.Ct. at 1236 n. 1 (citing *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 385 n. 20, 89 S.Ct. 1109, 1119 n. 20, 22 L.Ed.2d 344, *reh'g denied*, 394 U.S. 1024, 89 S.Ct. 1622, 22 L.Ed.2d 51 (1969)). However, *TWA* was also a post-certification case, and the basis for the quoted statement, the cited passage in *Trainmen*, actually suggests that the protections of Section 2, Fourth are *narrower* than those of section 7 of the NLRA. See 394 U.S. at 385 n. 20, 89 S.Ct. at 1119 n. 20.

Thus, the difference in language between the NLRA and the RLA (*i.e.*, the absence of "other concerted activities" language from Section 2, Fourth), the weight of the case law, as well as the legislative history[6] all favor a more limited reading of pre-certification protected activities under Section 2, Fourth of the RLA.

Because pre-certification wrongful discharge claims under the RLA have only recently been accepted by a number of courts, however, there is a paucity of caselaw on the exact scope of the activities protected in the absence of a formal union. Under the language of the RLA, Beckett's activities were protected only if he was attempting to "join, organize, or assist in organizing [a] labor organization," or to exercise his right to "organize and bargain collectively." 45 U.S.C. § 152, Fourth. It is clear he was not attempting actively to promote the IBT's organizing drive. Were it not for certain statements in Beckett's deposition, the Court might be inclined to conclude that a reasonable trier of fact could find plaintiff was attempting to organize an in-house union, and therefore was engaged in protected activities. The fact that Beckett felt his supervisory responsibilities would create a conflict were he to become a union leader would not,

in itself, preclude the possibility he was attempting to *form* an in-house union. However, Beckett clearly testified, on at least two occasions, that he had not taken any steps to organize an unaffiliated organization to represent Atlas crew members. Beckett Tr. at 492, 494. In the context of plaintiff's overall deposition testimony, he appears careful, articulate and frequently circumspect about saying anything that might be misconstrued. Thus, the Court must conclude that, by his own testimony, plaintiff was not organizing or attempting to organize an in-house union.

■ Nevertheless, Section 2, Fourth protects employee organization of "labor organization[s]." The Court will thus address whether that term may be construed more broadly than simply to include formal unions. The RLA does not define "labor organization," but section 2(5) of the NLRA states:

> The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C. § 152(5). Where the statutes contain analogous terms or provisions (unlike the situation regarding pre-certification protected activities), cases interpreting the NLRA should be applied in the RLA context. *Trans World Airlines*, 489 U.S. at 432, 109 S.Ct. at 1229–30 ("carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA."); *Lebow*, 86 F.3d at 665–66 (same).

The term "labor organization" was intended to be, and has been, interpreted very broadly under the NLRA. *See Electromation, Inc. v. NLRB*, 35 F.3d 1148, 1159 (7th Cir.1994) (citing legislative history); *NLRB v. Sweetwater Hosp. Ass'n*, 604 F.2d 454, 457 n. 5 (6th Cir.1979). In *Electromation*, the court upheld an NLRB determination that certain employee "action committees" consti-

---

6. The NLRA originally was intended to provide greater protections to employees in industries it covered, where the labor movement was "em-

bryonic," *Trainmen* at 385 n. 20, 89 S.Ct. at 1119 n. 20, than to employees in the "strongly organized" railway arena.

tuted "labor organizations" within the meaning of section 2(5). The employer had announced the implementation of certain cost-cutting measures which would have affected the conditions of employment for its non-unionized workers. *Id.* at 1151. When a number of employees expressed their dissatisfaction with the announced changes, the company decided to create "action committees" to propose alternative methods of satisfying its cost-cutting requirements. *Id.* at 1151–53. The company initially met with eight of its 200 employees in making this determination, then invited the workers to volunteer for membership on the committees, each of which was to address a separate area of workplace concern. *Id.* Ultimately, each of twenty-five employee volunteers sat on one of the five "action committees." When the IBT demanded recognition as the employees' collective bargaining representative, however, the employer terminated its involvement with the committees without having implemented a single committee proposal. At least one of the committees never actually met.

According to the court, the committees, as a whole, would constitute a NLRA "labor organization" if: "(1) the . . . employees participated in the committees; (2) the committees existed, at least in part, for the purpose of 'dealing with' the employer; and (3) these dealings concerned 'grievances, labor disputes, rates of pay, hours of employment or conditions of work.'" *Id.* at 1158. Relying on *NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959), the court found that an "an organization may satisfy the statutory requirement that it exist for the purpose in whole or in part of dealing with employers even if it has not engaged in actual bargaining or concluded a bargaining agreement." 35 F.3d at 1159.

In *Cabot Carbon,* the Supreme Court held that the phrase "dealing with" in section 2(5) of the NLRA is not synonymous with, but rather is more expansive than, the term "bargaining with." 360 U.S. at 210–13, 79 S.Ct. at 1020–22. Thus, employee committees existing at least in part to "deal with" employers concerning work conditions may be "labor organizations" even though they do

not " 'bargain with' employers in the usual concept of collective bargaining.' " *Id.* at 212–13, 79 S.Ct. at 1021 (quoting lower court opinion). Thus, the *Electromation* court ruled that the committees were section 2(5) "labor organizations," even though they did not purport to represent a majority of employees or attempt to negotiate collective bargaining agreements.

The Second Circuit has applied a similarly broad definition of "labor organizations." *See Bridgeport Fittings, Inc. v. NLRB,* 877 F.2d 180, 189 (2d Cir.1989) (organization need not have adopted constitution and by-laws or collected dues to be § 2(5) "labor organization"); *Montefiore Hosp. & Med. Ctr. v. NLRB,* 621 F.2d 510, 515 n. 5 (2d Cir.1980) ("group[s] of employees only informally joined together . . . have been held to come within the definition of a 'labor organization' "); *NLRB v. Philamon Labs., Inc.,* 298 F.2d 176, 178–79, 181 (2d Cir.) ("hastily assembled committee of employees," which held a single meeting with management, was § 2(5) "labor organization"), *cert. denied,* 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962). Cases holding that an individual, acting alone, cannot be a "labor organization," *see United States v. Ryan,* 225 F.2d 417, 421–22 (2d Cir.1955), *rev'd on other grounds,* 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956), do not preclude a finding that a group with a singe representative may be a "labor organization."

In this case, Beckett was elected by a group of employees to present to management their concerns regarding certain employment conditions, and to produce a questionnaire to solicit the views of all Atlas crew members regarding employment concerns. Defendant's Memorandum, at 6. On at least one occasion prior to the July 26, 1994 meeting, Beckett met with Atlas representatives to discuss crew members' employment conditions, and it appears the parties intended to schedule further meetings. Atlas does not contest that Beckett was elected to represent at least a minority group of crew members in these discussions, and has presented no evidence to suggest he did not convey crew members' concerns to his colleagues' satisfaction.

■ As demonstrated in *Electromation* and *Cabot Carbon,* a labor organization need not be the formal representative of a majority of affected employees, nor must it be engaged in formal collective bargaining. The group of Atlas crew members which Beckett represented was one in which employees participated, and appears to have existed, at least in part, for the purpose of "dealing with" management regarding "grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." Thus, a reasonable trier of fact might find this group was a "labor organization" within the meaning of Section 2, Fourth of the RLA.

■ Summary judgment should be granted only where "there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff has raised a genuine issue of fact as to whether he was exercising his rights to "join, organize, or assist in organizing [a] labor organization" within the meaning of Section 2, Fourth of the RLA. Thus, the Court cannot find, on this summary judgment motion, that he was not engaged in activities protected by the RLA. To the extent any other courts may have implied that Section 2, Fourth protects only the organization of formal unions, *see, e.g., Gullett Gin Co. v. NLRB,* 179 F.2d 499, 500, 502 (5th Cir.1950) (rejecting, in dicta, NLRB finding that small group of employees, "assembled for the purpose of gaining a raise in wages," was a "labor organization" within the meaning of section 2(5) of the NLRA), the Court declines to follow them. Such a limited reading does not comport with the broad construction of the term "labor organization" mandated by the NLRA and countenanced by the Supreme Court.

This is not to suggest Atlas was in an impossible situation, whereby terminating Beckett would subject it to a wrongful discharge claim and not doing so would subject it to a potential election challenge by the IBT. Rather, even if Beckett was engaged in protected activities, Atlas could have allayed its stated concerns about "tainting" a union election simply by discontinuing all meetings between Beckett and management regarding conditions of employment. Indeed, the fact-finder may ultimately determine that Atlas did seek did to implement such a strategy. In any event, the cases cited by Atlas in which the NMB has found employer interference in union elections appear to involve more sustained or egregious patterns of interference than could be alleged here, *see supra* nn. 2, 4, and none of those cases involves findings of election interference by an employer merely for failing to terminate an employee who mistakenly announces he is engaged in collective bargaining.

As to the remaining elements of his wrongful discharge claim, plaintiff has clearly demonstrated Atlas was aware of his activities, and has, at the very least, raised triable issues of fact concerning whether Atlas bore animus towards these activities and terminated him as a result. Therefore, defendant's motion for summary judgment must be denied.

## II. *LIMITATION OF LOST WAGES CLAIM*

■ Atlas further seeks partial summary judgment on Beckett's claim for lost wages, on grounds he had no guarantee of employment after his sixtieth birthday, fifteen months after his termination. As stated above, FAA regulations require the disqualification of commercial pilots at that age. *See* 14 C.F.R. § 121.383(c). It is clear that, as a matter of law, Atlas had no obligation to find other positions for age-disqualified pilots, so long as it had no policy of doing so for pilots disqualified on other grounds. *See TWA v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (ADEA case). Atlas claims it had no such policy, and Beckett does not dispute this. However, he claims he would have been hired by Atlas as a flight engineer or trainer upon his disqualification as a pilot, that he was given assurances of such future employment by Atlas management, and that other age-disqualified pilots continued to work at Atlas in such capacities. Plaintiff had no legal right to continued employment *per se,* and cannot recover for lost wages that are merely speculative. Nevertheless, whether he had a reasonable expectation of future employment, or was given

assurances of such employment by Atlas, remains a question of fact. Although the parties dispute whether such assurances were actually extended to Beckett, his testimony regarding them, albeit somewhat vague, at the least raises issues of his credibility for the fact finder. Therefore, defendant's motion for partial summary judgment on this issue is denied.

## III. AVAILABILITY OF PUNITIVE DAMAGES

Because the wrongful discharge cause of action has judicially been implied, the RLA obviously is silent on the issue of available remedies. In *International Bhd. of Electrical Workers v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the Supreme Court determined that punitive damages are not available in an employee's action against a union for breach of the duty of fair representation under the RLA. In doing so, the Court looked to the underlying purposes of the statute—promoting collective bargaining and industrial peace—and the consequences of allowing such awards. The Court reasoned that allowing union members to receive windfall recoveries from their unions could: a) "deplete union treasuries, thereby impairing the effectiveness of unions as collective-bargaining agents," *id.* at 50–51, 99 S.Ct. at 2127; and b) undermine the grievance process by encouraging unions to "process frivolous claims or resist fair settlements" for fear of limitless exposure in subsequent lawsuits. *Id.* Relying on *Foust*, Atlas argues that punitive damages should not be available to Beckett as a matter of law.

However, the Seventh Circuit recently distinguished *Foust* in a case, like this one, involving a non-unionized employee's claim of wrongful discharge under the RLA. *Lebow*, 86 F.3d at 671–72. The court reasoned that the considerations which swayed the *Foust* Court are not present in this type of case:

Awarding punitive damages to non-union employees would not interfere with the collective bargaining process because there is no collective bargaining process with which to interfere. On the contrary, if an employer discharges an employee for at-

tempting to organize a union, it is the employer that is interfering by chilling union activity. An employee cannot appeal to a union for help; his recourse is to file an individual suit, as [plaintiff] did. It is possible that if the only sanctions available are reinstatement and back pay, employers may not be sufficiently deterred from inappropriately discharging union organizers.

*Id.* at 672.

Several district court rulings echo *Lebow*'s reasoning. *See, e.g., Riley v. Empire Airlines, Inc.*, 823 F.Supp. 1016, 1021–23 (N.D.N.Y.1993) (distinguishing cases disallowing punitive damages in RLA cases on grounds they generally relate to unionized employees); *Brown v. World Airways, Inc.*, 539 F.Supp. 179, 181 (S.D.N.Y.1982) (Sand, J.) ("limitation of recovery to a backpay pittance ... might encourage such an employer to continue illegal discriminatory practices which impede efforts to unionize its employees"); *Freiburger v. Emery Air Charter*, 795 F.Supp. 253, 260 (N.D.Ill.1992) (following *Brown*); *cf Ghartey v. St. John's Queens Hosp.*, 727 F.Supp. 795, 797–98 (E.D.N.Y. 1989) (Nickerson, J.) (punitive damages not available, in light of *Foust*, for NLRA wrongful discharge claim "inextricably intertwined" with duty of fair representation claim asserted in same action), *reconsideration denied*, 745 F.Supp. 125 (E.D.N.Y.1990). *But see Tipton v. Aspen Airways, Inc.*, 741 F.Supp. 1469, 1470–71 (D.Colo.1990) (punitive damages not available under RLA).

In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 66, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (1992), the Supreme Court instructed that, with regard to implied statutory rights of action, "we presume the availability of all remedies unless Congress has expressly indicated otherwise." Following this directive, a number of courts have found punitive damages available in actions for wrongful or retaliatory discharge under other statutes. *See Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187 (1st Cir.1994) (Occupational Safety and Health Act of 1970); *Oldroyd v. Elmira Sav. Bank*, 956 F.Supp. 393, 400–02 (W.D.N.Y.1997) (Financial Institutions Reform, Recovery, and Enforcement Act); *DeLeo v. City of Stam-

*ford,* 919 F.Supp. 70, 72–74 (D.Conn.1995) (Rehabilitation Act of 1973, as amended). In light of this case law and the policy justifications articulated in *Lebow,* the Court concludes that punitive damages are available (although not necessarily warranted) in this RLA wrongful discharge case.

## IV. *RIGHT TO JURY TRIAL*

██ The parties agree that any right to a jury trial for this implied cause of action depends solely on the interpretation of Seventh Amendment jurisprudence. The Seventh Amendment guarantees the right to trial by jury where legal, as opposed to purely equitable, rights and remedies are at issue. *Chauffeurs, Teamsters & Helpers. Local 391 v. Terry,* 494 U.S. 558, 564–65, 110 S.Ct. 1339, 1344–45, 108 L.Ed.2d 519 (1990). While Atlas cites to a three-part test announced in *Ross v. Bernhard,* 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 738 n. 10, 24 L.Ed.2d 729 (1970) (status of the cause of action before merger of law and equity; nature of remedy sought; and practical ability and limitations of juries to decide issues), the more recent *Terry* decision appears to have dropped the last of those elements. *See Wooddell v. International Bhd. of Elec. Workers,* 502 U.S. 93, 97, 112 S.Ct. 494, 497–98, 116 L.Ed.2d 419 (1991) (applying two-prong test); *DeLeo,* 919 F.Supp. at 75–76 (same). In *Terry,* the Supreme Court described a two-part analysis for determining whether a cause of action sounds in law or equity:

> "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." The second inquiry is more important in our analysis.

494 U.S. at 565, 110 S.Ct. at 1345 (quoting *Tull v. United States,* 481 U.S. 412, 417–18, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987)). Once a court determines that an action "belongs in the law category," the Supreme Court directs it to inquire "whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791." *Markman v. Westview Instruments, Inc.,* —— U.S. ——, ——, 116 S.Ct. 1384, 1389, 134 L.Ed.2d 577 (1996).

Since collective bargaining. was illegal in 18th century England, *Terry* at 565–66, 110 S.Ct. at 1344–45, suits alleging violation of the right to organize have no historical predecessor in the pre-merger courts of law or equity. In *Terry,* the Supreme Court analogized an employee's duty of fair representation claim to an action by a trust beneficiary against a trustee for breach of fiduciary duty, an historically equitable claim. *Id.* at 566–69, 110 S.Ct. at 1345–47. The Court also found an employee's statutory claim against an employer for breach of a collective bargaining agreement comparable to a common law breach of contract claim, which is historically legal in nature. *Id.* at 569–70, 110 S.Ct. at 1347–48.

Applying a similar approach, the *Lebow* court found RLA wrongful discharge claims analogous to common-law breach of contract and tort claims, each historically legal in nature. 86 F.3d at 668–69. The court reasoned that the RLA creates, as an implied term of employment, the condition that an employee may not be terminated for engaging in union activities. *Id.* at 668. Thus, terminations in violation of that implied term are akin to breaches of contract. *Id.* Also, the court stated, the RLA defines a legal duty of employers (to allow employees to engage in union organizing) and allows tort-like actions for breach of that duty. *Id.* at 669; *see also Reich,* 26 F.3d at 1192 ("[r]etaliatory discharge has been treated as an intentional tort"); *Oldroyd,* 956 F.Supp. at 401–02 (same).

In *Maas v. Frontier Airlines, Inc.,* 676 F.Supp. 224, 225–26 (D.Colo.1987), the court ruled that a RLA wrongful discharge plaintiff was not entitled to trial by jury, partly because "the claim has no common law counterpart." *Id.* at 226. The *Maas* court did not attempt to draw analogies to common law causes of action, as the Supreme Court has directed, and the Court finds *Lebow's* analysis more persuasive. The Seventh Circuit's analogies to common law actions, particularly the comparison with common-law tort ac-

tions, are reasonable, and mitigate in favor of finding that RLA wrongful discharge claims are analogous to pre-merger actions at law. *Cf. Caputo v. National Ass'n of Letter Carriers*, 730 F.Supp. 1221, 1234–36 (E.D.N.Y. 1990) (Glasser, J.) (right to jury trial exists in duty of fair representation action).

The next question, then, is whether the remedies Beckett seeks are legal or equitable in nature. In *Lebow*, the Seventh Circuit concluded that because "punitive damages have traditionally been viewed as a legal remedy that must be imposed by a jury," a court's determination that such damages are available in a RLA wrongful discharge case is determinative of the question of the right to jury trial. 86 F.3d at 669–70, 672 n. 15 ("[w]e cannot agree that Lebow could have a right to request punitive damages but not to demand a jury trial.... Because we hold that Lebow has the right to seek one form of legal relief (punitive damages), a jury trial is necessary, and we need not decide whether the other relief sought (reinstatement with back pay and benefits) qualifies as legal or equitable.").

But, in *Hodges v. Virgin Atlantic Airways*, 714 F.Supp. 75, 76–78 (S.D.N.Y.1988) (Stanton, J.), the court held that an RLA wrongful discharge action seeking reinstatement and back pay was equitable in nature, and the "mere fact that plaintiffs seek punitive damages does not change the nature of their claim to a legal one." The court's statement regarding punitive damages is supported by a citation to, and extensive quotation of, *Lynch v. Pan Am. World Airways, Inc.*, 475 F.2d 764, 765 (5th Cir.1973). *Lynch* states that "unsupported allegations for ... punitive damages [will not] alter the genre of the proceeding." *Id.* The *Lebow* court explicitly distinguished *Lynch*, ruling that the wrongful discharge plaintiff in that case had gone beyond "unsupported allegations" by "properly alleg[ing] the type of intentional misconduct (firing him for engaging in protected activity) for which punitive damages may be awarded." 86 F.3d at 670. Also, the Third Circuit explicitly rejected *Lynch* in *Laskaris v. Thornburgh*, 733 F.2d 260, 263–64 (3d Cir.), *cert. denied*, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984), holding that a claim for

punitive damages entitles a plaintiff to trial by jury if appropriately raised in the pleadings; no specific additional facts or evidence need be presented. In this case, the Court concludes that, because punitive damages are available for this cause of action, the remedies sought are at least partially legal. Because, as stated above, the nature of the claim itself is also legal, Beckett is entitled to a jury trial.

Even if the claim for punitive damages alone were not sufficient to require a jury, Beckett also seeks compensatory damages, which are considered legal in nature, *Terry*, 494 U.S. at 570, 110 S.Ct. at 1347–48 (money damages are traditional form of legal relief), except to the extent this demand represents a claim for back pay which is incidental to injunctive relief such as reinstatement. See *Terry*, 494 U.S. at 571, 110 S.Ct. at 1348; *Russell v. Northrop Grumman Corp.*, 921 F.Supp. 143, 151–53 (E.D.N.Y.1996) (Seybert, J.); *Hodges*, 714 F.Supp. at 77; *Maas*, 676 F.Supp. at 226; *Thomas v. Resort Health Related Facility*, 539 F.Supp. 630, 635–36 (E.D.N.Y.1982) (Neaher, J.) (42 U.S.C. § 1981 back pay claim not tied to reinstatement is legal).

For the reasons articulated above, defendant's motion for summary judgment is denied, as are its motions to limit plaintiff's claim for lost wages and to strike plaintiff's demands for punitive damages and trial by jury.

SO ORDERED.